**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHARLES KIRWIN STIEF,

                              CASE NO. 16-11923

        *Plaintiff*,            DISTRICT JUDGE PAUL D. BORMAN

*v.*                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 22)**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Stief is not disabled. Accordingly, **IT IS RECOMMENDED** that Stief's Motion for Summary Judgment, (Doc. 17), be **DENIED**, the Commissioner's Motion, (Doc. 22), be **GRANTED**, and this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Charles Stief's ("Stief") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et*

*seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 22).

Stief previously submitted an application for disability benefits, and the first ALJ to hold a hearing found him not disabled. (Tr. 168-86). The decision became binding.

On May 10, 2011, Stief filed an application for DIB, alleging a disability onset date of August 9, 2010. (Tr. 344-45). The Commissioner denied his claim. (Tr. 207-19). Stief then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on November 1, 2012 before ALJ Patricia S. McKay. (Tr. 109-48). The ALJ issued an unfavorable decision, but the Appeals Council remanded the case and instructed her to obtain supplemental evidence from a vocational expert ("VE") to clarify the extent to which Stief's assessed limitations would reduce his occupational opportunities. (Tr. 235-38). At Stief's next hearing, he testified alongside Vocational Expert ("VE") Michael E. Rosko. (Tr. 40-108). The ALJ's written decision, issued September 4, 2014, found Stief not disabled. (Tr. 24-34). On March 25, 2016, the Appeals Council denied review, (Tr. 1-6), and Stief filed for judicial review of that final decision on May 27, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014)

2

(internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment
> or combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial
> gainful activity, has a severe impairment that is expected to
> last for at least twelve months, and the severe impairment
> meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be
> disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past
> relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her
> past relevant work, if other work exists in the national
> economy that plaintiff can perform, in view of his or her age,
> education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of*

*Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if

the analysis reaches the fifth step without a finding that the claimant is not disabled.

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the

4

Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Stief not disabled under the Act. (Tr. 24-34). At Step One, the ALJ found that Stief last met the insured status requirements of the Social Security Act on March 31, 2013, and had not engaged in substantial gainful activity in the interval between his alleged onset date of August 10, 2010 and his date last insured. (Tr. 26). At Step Two, the ALJ concluded that the following impairments qualified as severe: history of cerebrovascular aneurysm with surgical repair with cognitive disorder and affective disorder; right knee medial meniscal tear status post arthroscopy and partial medial meniscectomy; depressive disorder; and headaches. (Tr. 26-27). The ALJ also decided, however, that none of these met or

5

medically equaled a listed impairment at Step Three. (Tr. 27-28). Thereafter, the ALJ found that Stief had the residual functional capacity ("RFC") to perform light work except that:

> he must avoid workplace hazards such as moving machinery, unprotected heights and climbing of ladders/ropes/scaffolding; and, he is able to occasionally crouch, crawl, kneel, stoop, bend and climb stairs. Furthermore, the claimant is limited to low stress, self-paced simple work that consists of one to two step tasks; occasional contact with coworkers and supervisors; and, no team or tandem duties with coworkers.

(Tr. 28-29). At Step Four, the ALJ found Stief incapable of performing his past relevant work as a retail manager, food service manager, or business consultant. (Tr. 19). But proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (Tr. 33).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Stief's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

Stief filled out a Function Report on March 3, 2011, which appears in the record. (Tr. 388-95). Describing his conditions, he wrote: "I am tired all day because of sleeping issues and blood pressure medication. A few times a week I have strong headaches that cause me to lay down. On a daily basis I have memory laps[e] and forget to do daily

activities. I forget or lo[se] personal items that I need for daily life. I become very depressed and angry because of memory issues. I have trouble working on computers, reading and writing because of memory and concentration problems. When I try something new I get anxiety feelings which causes me to be forgetful. Social skills have become hard for me to communicate because I studder [sic] and can't remember what I was talking about." (Tr. 388). In a typical day he would take breaks due to headaches, bathe and take his medications "if I can remember," and "do chores or physical activity" even though he struggled at times to complete tasks. (Tr. 389). His conditions interfered with his sleep in that "dreams feel as though they are reals o when I wake up I feel as I didn't sleep at all. Insomnia frequently. It's hard to sleep with headaches, I sleep during the day because I'm so tired." (*Id.*). He lived in a condo with his mother, and also cared for his son. (Tr. 388-89). Before his onset date, he would "work, use [the] computer, read, [engage in] physical activity, be social, spell[] [properly], sleep, [do] mechanical things, remember [things], [and play] sports." (*Id.*).

Prompted to list issues with activities of daily living, Stief noted that he sometimes forgot to bathe and wear deodorant. (*Id.*). His mother reminded him to groom and take his medication. (Tr. 390). He typically cooked microwavable foods and other meals easy to prepare "like cereal." (*Id.*). He could do laundry, but "no outside or inside physical chores because I get dizzy and headaches." (*Id.*). He did laundry on a weekly basis because "it takes days." (*Id.*). He left the house every other day, and could drive a car. (Tr. 391). His trips included weekly shopping for "food, household goods, cloth[e]s, medication, [and]

personal items." (*Id.*). He retained the ability to pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*).

Present hobbies included "playing basketball, being with and raising my son, ski[i]ng, baseball, golf, traveling, volunteering at church and hospital," and "coaching." (Tr. 392). He did these things "weekly when I feel O.K." (*Id.*). However, "I can't play sports anymore because I get very dizzy and depressed. I cannot be committed to these hobbies and interest[s] because of my health," though he tried "to be involved if I can as long as I feel normal, and well." He enjoyed spending "time with my son," teaching him "to take care of his needs," and going with him "to the library" and "movies, . . ." (*Id.*). He also regularly visited church, doctors' offices, playgrounds, and the post office. (*Id.*).

"I go places when I feel O.K. I have trouble interacting with people I don't know so sometimes I don't take part much." (*Id.*). Stief described anger troubles that moved him to "get angry and yell and sometimes physical with family and friends." (Tr. 393). Asked to tick boxes for abilities with which he had difficulty, Stief identified: lifting, squatting, bending, kneeling, stair climbing, memory, completing tasks, concentration, following instructions, and getting along with others. (*Id.*). He could pay attention for "less than a minute," and could not follow written or spoken instructions well. (*Id.*). Stress, as well as changes in routine, gave him "headaches and anxiety. I start to forget words and studder [sic]. I become light-headed." (Tr. 394).

### ii.      Stief's Testimony at the Administrative Hearing

Dr. Terlep joined Stief via phone at the hearing, and the ALJ began by granting Stief's attorney leave to question him. (Tr. 49-50). After providing an overview of his

medical background and experience, (Tr. 50-51), Dr. Terlep noted that he had been treating Stief since 2008 got "anxiety and depression, secondary to [his] brain surgery," (Tr. 52). Proclaiming familiarity with the disability listings, Dr. Terlep then opined that Stief suffered "a severe memory impairment, both of short term memory, intermediate, and long term memory." (Tr. 52-53). *See generally* (Tr. 53-56) (summarizing evidence spanning a number of years which showed chronic anger, depression, and memory and concentration difficulties). Temper outbursts arose from "unordinary stressors," such as others' tardiness. (Tr. 56). "Sometimes the anger is expressed physically, by verbally challenging the person. . . . And then often times it can go into like a depression and a withdrawal and just leaving the whole problem as Mr. Stief withdraws." (Tr. 57). These episodes occurred "[a]t least several times a month." (*Id.*). "They make him unemployable, because he would be unable [sic] the ordinary stress that's called going to work." (Tr. 58). According to Dr. Terlep, Stief began "reporting more frequently about increasing memory difficulties" around 2012 or 2013. (Tr. 59). "I am seeing more anger and more liability with Mr. Stief say over the past year than in the prior time." (Tr. 60). Indeed, his anger episodes would cause him to decompensate "[a]t least once a month." (Tr. 62). "When anything kind of rocks the boat, then we get the[] behaviors." (Tr. 63). Even a "low stress job is going to stress him fairly rapidly." (Tr. 64).

Upon questioning by the ALJ, Dr. Terlep indicated that he saw Stief each month for an hour session, and did not prescribe any medications. (Tr. 65). To his knowledge, Stief currently lived alone with his young child. (Tr. 66). After this brief interlude, Stief's attorney resumed questioning. Dr. Terlep indicated that Stief's mother was moved to a

nursing home, which "remove[d]" certain "stressor[s]," but "[o]n a regular basis he has trouble with activities of daily living, remembering to keep stuff up, at times just letting shaving go and stuff like that." (Tr. 67).

The ALJ then questioned Stief about his conditions. He indicated that he lived alone, and shared custody of his nine-year-old son three days per week. (Tr. 70). Since his last hearing with the prior ALJ in August 2010, "I have noticed that my memory has gotten a lot worse, especially short term." (Tr. 71). His anxiety had also exacerbated. (*Id.*). "I am so fearful of what is going to happen to me. I've, you know, been through a lot as far as my surgery and I have one kidney. I had the kidney removed. I have had a lot of surgeries. I often think about what's going to happen with me and it puts me into a depression and anxiety in certain situations. I think about that a lot when I am trying to sleep." (Tr. 72). He confirmed that he had not worked since the prior ALJ rendered his decision. (Tr. 73).

He described the brain surgeries that brought on a number of the problems he currently endured. (*Id.*). "I had to learn how to talk, I had to learn how to walk, I had to learn how to add and subtract. I had to learn how to read and so 2007, that whole part of that year was really one that I don't remember. I remember bits and pieces." (Tr. 74).

Asked about items from his Function Report, Stief denied volunteering anymore because it made him feel "stupid" because "I was having trouble correcting the exams" given for the volunteer speech therapy group he worked with. (Tr. 76). He could still drive, however, and he drove to the hearing. (Tr. 77).

In an average day, Stief would often feel "exhausted" because of his trouble sleeping. (Tr. 78). Without help from his siblings, Stief would care for his mother who "had Parkinson's that had progressed within months . . . ." (Tr. 79). When this became too difficult, Stief took measures to move her to a nursing facility. (Tr. 79-80). He denied providing the care directly though because "I am too frustrated"; rather, he "had someone coming in and helping mom." (Tr. 80). He presently lived in an apartment on his own, and would take care of his son three days per week. (*Id.*). He expressed satisfaction with his medications, whose only "effect that I can feel is that they work." (Tr. 81). He denied drinking alcohol or smoking cigarettes as well. (*Id.*).

In describing why he could not work, or what made him disabled, Stief noted his "memory problems" and how they made life a "daily struggle . . . ." (Tr. 82). As a result of his memory problems, he encountered difficulty with anger, lack of confidence, and depression. (*Id.*).

Stief's attorney then posed some questions to him. First, Stief described his headaches as "severe" and triggered by anxiety. (Tr. 83). "[W]hen I am put in a situation that causes me anger or causes me . . . anxiety" "[t]hey get much worse." (*Id.*). "I couldn't sneeze for six months because it hurt so bad." (Tr. 84). Aside from headaches, Stief also testified to chronic dizziness and, as a result, an inability to play sports with his son. (*Id.*). Panic attacks, which occurred intermittently, could last forty-five minutes to an hour. (Tr. 85). He also avoided socializing because it caused further anxiety and depression, and this frequently happened on trips to the grocery store. (Tr. 86, 91). He experienced "crying spells" "quite a bit." (Tr. 87). He cooked only "easy stuff" because

he could not "put together a meat loaf or a pot roast or a big huge dinner. That's too much for me." (Tr. 92).

### iii.      The VE's Testimony at the Administrative Hearing

After noting that Stief had no prior relevant work, the ALJ shifted straight to Step Five. (Tr. 97). In the first hypothetical—which mimicked one on which the prior ALJ based his decision in 2010—the ALJ asked the VE to assume a person able to perform a full range of light work but who "must avoid climbing ladders, ropes, and scaffolding. But he could occasionally engage in crouching, crawling, kneeling, stooping, or bending, climbing stairs. He needs to avoid working around hazards and he would be limited to work that is simple, simple work that consists of one or two steps. . . . Are there any unskilled jobs that exist today that a hypothetical person could perform?" (Tr. 97). The VE identified "jobs involving packing and inspection"—with 5,000 regional job availabilities and 150,000 national job availabilities—"mail sorter"—with 1,500 regional job availabilities and 60,000 national job availabilities—jobs involving "simple assembly"—with 3,000 regional job availabilities and 90,000 national job availabilities. (Tr. 98). Asked whether an additional limitation of "lifting no more than 10 pounds" would affect these figures, the VE indicated that it would eliminate mail sorting entirely and "cut the number of other jobs by 50 percent." (Tr. 98-99).

The ALJ added another wrinkle: "if the person were restricted to . . . sedentary work, would there be any jobs that exist for that person with the initial limitations identified by Judge Grappel . . . ?" The VE indicated that jobs such as "simple assembly, sorting, various types of product processing," and "product finishing" would provide

3,600 regional job availabilities and 100,000 national job availabilities. (Tr. 99). No such job would require more than occasional contact with coworkers or supervisors. However, if the person were unable to work in teams or tandem with his coworkers, "that factor would reduce the number of jobs by 50 percent, the remaining job by 50 percent." (Tr. 100). The remaining jobs would be "self paced piece work," not "production rate" work. (*Id.*).

In the next hypothetical, the ALJ asked of a person "likely to be off task say at least 20 percent of an average work day and this a reoccurring chronic thing that is going on with this individual. How does that affect the ability to perform these jobs, these self paced jobs, that the person is basically working by themselves?" (Tr. 101). The VE indicated that such an additional limitation would be work-preclusive. (*Id.*). The VE added that a person would have to be able to maintain focus and attention for "[a]t least 90 percent of the work day, aside from scheduled breaks." (Tr. 102). Also, "someone missing more than two days per month on a routine basis" would "not be competitively employable." (*Id.*). The ALJ asked what an acceptable or allowable absenteeism rate might be for the jobs in question, and the VE indicated that "[t]he most that I have seen would be two per month . . . on average." (*Id.*).

Asked whether, assuming the accuracy of Stief's testimony, a person with Stief's limitations might find a job, the VE said, "I simply can't think of any jobs that he could do based on his testimony." (Tr. 103).

13

F.    **Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

14

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

15

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

When the Appeals Council remanded, it instructed the ALJ update the medical evidence as required, give further consideration to Stief's maximum residual functional capacity with specific references to evidence of record, and to obtain supplemental evidence from a VE at Steps Four and Five. (Tr. 236-37). On remand, the ALJ properly addressed Stief's prior RFC and deviated therefrom to "account for the deterioration in [his] functional capacity since August 9, 2010." (Tr. 29). Neither party has argued that the ALJ failed to apply the correct standard under *Drummond* and the relevant regulations.

Stief puts forth three arguments in his brief: (1) the ALJ improperly weighed opinions from his three "treating physicians," (Doc. 17 at ID 913-27); (2) the ALJ disregarded Dr. Terlep's testimony that Stief's conditions met Listings 12.02 and 12.04,

18

(Doc. 17 at ID 927-31); and (3) the ALJ failed to conduct a full and fair hearing, (Doc. 17 at ID 932-33). I consider each argument in turn.

### 1.    Treating Physicians

Stief contends that the ALJ improperly weighed opinion evidence from Dr. Hoffman, Dr. Vollmer, and Dr. Terlep, who he alleges are treating physicians. Not only are these opinions consistent with each other, he suggests, but they are consistent with other evidence—particularly Dr. Madej's opinion—in the record. The Commissioner responds by defending the ALJ's weight assignments with respect to the state agency consultants *and* Stief's treating physicians. It also attempts to distinguish the opinion of the consultative examiner, Dr. Madej, from those of Stief's treating physicians.

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating* source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or

subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

Although Stief argues that Dr. Hoffman qualifies as a treating physician, she plainly does not. Stief met with Dr. Hoffman only twice, with a two-year interval between the first and second visit; this was not an ongoing treatment relationship of the sort contemplated by the regulations. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.' . . . A physician seen infrequently can be a treating source 'if the nature and frequency of the treatment or evaluation is typical for [the] condition.'" (quoting 20 C.F.R. § 404.1502)). Absent any developed argument that these two appointments sufficed to establish a treating relationship, the record tends to support the Commissioner's view that Dr. Hoffman was merely an examining source. In this sense, the ALJ needed only provide information sufficient to trace her weight assignment—she fulfilled this duty. (Tr. 30). Moreover, Stief offers no suggestion that records from the first such visit—which preceded Stief's alleged onset date—show deterioration. *See Gentry v. Comm'r of Soc. Sec.*, No. 11-15422, 2013 WL 1211566, at *2 (E.D. Mich. Mar. 25, 2013) ("Evidence outside of the relevant period must relate . . . to Plaintiff's medical condition during the relevant time period." (citing *Price v. Chater*, 106 F.3d 401 (6th Cir. 1996))).

Importantly, the ALJ's conclusion withstands scrutiny: an ability to live alone, complete simple tasks such as driving, and care for a young child three days per week undermines Stief's claim to the sort of disabling mental impairment Dr. Hoffman found. (Tr. 30); *see, e.g.*, (Tr. 70, 80, 388-89, 391). Opinions from Dr. Madej and Dr. Csokasy contained findings such as a relatively high GAF score and continued functional abilities which, as the ALJ discussed, also conflicted with Dr. Hoffman's assessment. (Tr. 30-32); *see, e.g.*, (Tr. 211) (Dr. Csokasy ranking the 'B' criteria similarly to the ALJ); (Tr. 506) (Dr. Madej recommending "[a] referral to the Michigan Department of career Development for evaluation and placement in a work training program, . . ."); (Tr. 507) (Dr. Madej assessing a GAF of "61-65" with a "fair" prognosis). Such considerations fall squarely within the ALJ's purview. *Accord, e.g. Moore v. Comm'r of Soc. Sec.*, No. 2:14-CV-911, 2015 WL 4399787, at *6 (S.D. Ohio July 17, 2015), *report and recommendation adopted,* No. 2:14-CV-911, 2015 WL 5749464 (S.D. Ohio Sept. 30, 2015) ("The ALJ was . . . entitled to use the activities of daily living in order to discount Dr. Meiring's opinions to some degree, and to consider whether other sources—such as Dr. Reece or the state agency reviewers—expressed a more consistent view of Plaintiff's mental functional capacity."). That Dr. Hoffman declined to translate her findings into functional limitations—opting instead to declare Stief entitled to disability benefits, an issue reserved to the Commissioner—reinforces the ALJ's weight assignment as to her. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed

21

objective criteria and documentation'" (quoting *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992)).

The ALJ's evaluation of Dr. Vollmer's and Dr. Terlep's records likewise pass muster under the relevant regulations. Unlike Dr. Hoffman, Dr. Vollman certainly qualifies as a treating physician. The ALJ, however, provided good reasons for discarding his opinions, citing both their lack of underlying evidence as well as Stief's involvement in their production. (Tr. 31). Although Dr. Vollman certainly expressed opinions on a check-box form, he did so in conclusory fashion and took no measures to illustrate his conclusions' underlying rationales. (Tr. 563-64); *e.g.*, *Greene-Howard v. Comm'r of Soc. Sec.*, No. 16-12621, 2017 WL 2118256, at *10 (E.D. Mich. May 15, 2016) ("It is well settled that a check-the-box form, unaccompanied by explanation, is entitled to little or no weight, because 'it is nearly impossible to analyze' the justification for the checked boxes." (citing *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016))). That Stief helped Dr. Vollmer complete an assessment also detracts considerably from its reliability—particularly where, as here, Stief does not challenge the ALJ's adverse credibility finding. (Tr. 804); *cf. Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) ("These doctors formed their opinions solely from Smith's reporting of her symptoms and her conditions, and the ALJ found that Smith was not credible."). Dr. Terlep similarly furnished opinions lacking explanation for their dire projections, (Tr. 560-62, 595-97), and standing in stark contrast to Stief's "numerous activities of daily living," as well as his capacity to care for his ailing mother and live "alone without a structured environment." (Tr. 31); *see, e.g.*, (Tr. 77, 80, 388-89). That the ALJ grappled

with the relevant considerations in evaluating these opinions also shines through the ALJ's criticism thereof. (Tr. 30-32); *cf. Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006) ("The ALJ thus 'met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation.'" (quoting *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005))).

For these reasons, the ALJ's decision to discount opinions from these medical sources is supported by substantial evidence.

### 2. Listings 12.02 and 12.04

Stief next argues that Dr. Terlep's testimony would support finding that he meets Listings 12.02 and 12.04, and that the ALJ improperly discounted his opinion "[e]ven though there [was] no contrary evidence from a treating or examining medical source, . . ." (Doc. 17 at ID 929). In so doing, Stief avers that the ALJ substituted his own medical judgment for that of medical professionals in the record and ignored conclusive evidence of disability. (Doc. 17 at ID 929-31).

Listings 12.02 and 12.04 "have three paragraphs, designated A, B, and C," and to meet either listing a claimant must fulfill paragraphs A and B *or* paragraphs A and C. 20 C.F.R. Pt. 404, Subpart P, App. I. Listing 12.02 requires:

> A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:
> 1. Complex attention;
> 2. Executive function;
> 3. Learning and memory;
> 4. Language;
> 5. Perceptual-motor; or

      6. Social cognition.
        AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning[:]
      1. Understand, remember, or apply information . . . .
      2. Interact with others . . . .
      3. Concentrate, persist, or maintain pace . . . .
      4. Adapt or manage oneself . . . .
        OR

C. Your mental disorder in this listing category is 'serious and persistent;' that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
      1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder[;] and
      2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life . . . .

*Id.* Paragraphs B and C of Listing 12.04 and 12.02 are identical. But paragraph A of Listing 12.04 requires:

A. Medical documentation of the requirements of paragraph 1 or 2:
      1. Depressive disorder, characterized by five or more of the following:
        a. Depressed mood;
        b. Diminished interest in almost all activities;
        c. Appetite disturbance with change in weight;
        d. Sleep disturbance;
        e. Observable psychomotor agitation or retardation;
        f. Decreased energy;
        g. Feelings of guilt or worthlessness;
        h. Difficulty concentrating or thinking; or
        i. Thoughts of death or suicide.
      2. Bipolar disorder, characterized by three or more of the following:
        a. Pressured speech;
        b. Flight of ideas;
        c. Inflated self-esteem;
        d. Decreased need for sleep;
        e. Distractibility;
        f. Involvement in activities that have a high probability of painful consequences that are not recognized; or
        g. Increase in goal-directed activity or psychomotor agitation.

*Id.*

Without discussing the paragraph A criteria for either listing, the ALJ found that Stief's condition fulfilled neither the paragraph B nor C criteria. She first found that Stief suffered only mild restrictions as to activities of daily living, moderate difficulties as to social functioning and concentration, persistence or pace, and no extended episodes of decompensation; thus the paragraph B criteria were not fulfilled. (Tr. 27-28). She next found that Stief's depressive symptoms were intermittent and not accompanied by: (a) repeated episodes of decompensation of extended duration, (b) a residual disease process that would cause even a minimal increase in mental demands or change of environment to prompt him to decompensate, or (c) a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement; accordingly, the paragraph C criteria were not fulfilled. (Tr. 28).

Although Stief correctly notes that the ALJ does not expressly discuss Dr. Terlep's view as to these listings at Step Three, the ALJ clearly considered his input in crafting her own opinion, as demonstrated by her lengthy discussion of Dr. Terlep's and Dr. Csokasy's findings as to the paragraph B and C criteria later in the text. (Tr. 30-32). And, as discussed in the previous section, the ALJ supplied a number of valid reasons for discrediting Dr. Terlep's opinion. (Tr. 27-28, 30-31).

### 3.    Full and Fair Hearing

Stief's final objection may be divided into two prongs: (i) that the ALJ "fail[ed] to discharge her duty by not questioning Dr. Terlep about supposed 'inconsistencies'

between his opinions and the evidence, which she then use[d] to discredit him"; and (ii) the ALJ "improperly picks and chooses among the evidence." (Doc. 17 at ID 932). As the Commissioner astutely notes, however, the ALJ commended the thorough questioning of Dr. Terlep performed by Stief's attorney, which brought on record a number of details regarding Dr. Terlep's assessment for the ALJ to weigh, as she did in her opinion. (Tr. 58-61, 65-66). *Compare Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-53 (6th Cir. 1983) (reversing for the ALJ's failure to develop the administrative record where the claimant was unrepresented and inarticulate, and the hearing lasted only twenty-five minutes), *with* (Tr. 40-108) (Stief was represented and able to answer the ALJ's questions, his counsel questioned Dr. Terlep thoroughly, and the hearing lasted nearly two hours). The ALJ was not required to delve deeper at the hearing. Additionally, Stief's cherry-picking argument lacks merit, for the ALJ's decision (as discussed at length above) is supported by substantial evidence. "Arguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual." *Albanna v. Comm'r of Soc. Sec.*, No. 15-CV-14264, 2016 WL 7238925, at *12 (E.D. Mich. Nov. 22, 2016), *report and recommendation adopted,* No. 15-14264, 2016 WL 7210715 (E.D. Mich. Dec. 13, 2016) (quoting *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014)).

For these reasons, Stief cannot show that the ALJ failed to accord him a full and fair hearing.

### H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Stief's Motion for Summary Judgment, (Doc. 17), be **DENIED**, the Commissioner's Motion, (Doc. 22), be **GRANTED**, and this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.

27

R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 23, 2017                                  S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 23, 2017                              By s/Kristen Castaneda
                                                Case Manager

28